**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LIBERTY INSURANCE UNDERWRITERS, INC., an Illinois corporation,

Plaintiff,

v.

DAVID H. REIMER, an individual, DAVID H. REIMER, P.A., a Florida professional association, REIMER AND ROSENTHAL, LLP, a Florida limited liability partnership, and BRIAN DORFMAN, and individual,

Defendants.

Case No. ____________________

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff LIBERTY INSURANCE UNDERWRITERS, INC. ("Liberty") pursuant to FED. R. CIV. P. 57 and 28 U.S.C. § 2201, respectfully submits this Complaint for Declaratory Judgment against Defendants, DAVID H. REIMER ("Reimer"), DAVID H. REIMER, P.A., (the "Reimer Law Firm" or the "Policyholder"), REIMER & ROSENTHAL, LLP and BRIAN DORFMAN ("Dorfman" or "Claimant"), and states as follows:

### Parties, Jurisdiction, and Venue

1. Liberty is a foreign corporation incorporated in the State of Illinois, with its principal place of business in the Commonwealth of Massachusetts, and is authorized to do business in the State of Florida.

2. David H. Reimer is a citizen of the State of Florida, is over the age of eighteen, and is otherwise *sui juris*.

3. David H. Reimer, P.A., is a professional association incorporated in the State of Florida, with its principal place of business in Florida, and was authorized to do business in Florida until September 26, 2014. At all times relevant, David H. Reimer, P.A. had one attorney: David H. Reimer.

4. Reimer & Rosenthal, LLP, was a Florida limited liability partnership formed in the State of Florida, with its principal place of business in Florida, and was doing business in Florida until July 1, 2012.

5. Brian Dorfman is a citizen of the State of Tennessee, is over the age of eighteen, and is otherwise *sui juris*.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because of the complete diversity of citizenship and residency between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7. Venue is proper before this Court pursuant to 28 U.S.C. § 1391.

## Factual Background

### The Insurance Policy and Application

8. Liberty issued a Lawyers Professional Liability insurance policy to David H. Reimer, P.A., designated policy no. LPM200838-0112 (the "Policy") for the law firm, with a policy period from July 18, 2012 to July 18, 2013, according to the terms and conditions set forth therein. (A true and correct copy of the Declarations of the Policy is attached hereto as Exhibit "A" and a true and correct copy of the Policy is attached hereto as Exhibit "B".)

9. Annexed to the Policy is the Renewal Application for insurance. (A true and correct copy of the Renewal Application is attached hereto as Exhibit "C".)

10. Section 1A. of the Renewal Application, titled, "Personnel – List all Lawyers to be covered; (DO NOT list "of counsels", independent contractors or per diem lawyers")" requested David H. Reimer, P.A. to list all lawyers to be covered under the Policy. *Id.*

11. The sole lawyer listed to be covered under the Policy was David H. Reimer. *Id.*

12. Question 5 of the Renewal Application for insurance, titled, "Claims, Incidents & Disciplinary Actions," specifically asked, "After inquiry, have any of the following occurred during your expiring policy: … C. Incidents or circumstances that could result in a claim?" *Id.*

13. In response, a check mark was placed next to the word, "No." *Id.*

14. The Renewal Application for insurance was signed by Reimer, as president of David H. Reimer, P.A., on June 22, 2012. *Id.*

15. Annexed to its Renewal Application for insurance, David H. Reimer, P.A. completed a Merger and Acquisition Questionnaire dated June 26, 2012 ("Questionnaire") (A true and correct copy of the Questionnaire is attached hereto as Exhibit "D".)

16. The Questionnaire specifically asked, "Does the firm do any merger or acquisition work?" *Id.*

17. An "X' was placed next to the word, "No." *Id.*

18. The Questionnaire was signed by Reimer, as owner of David H. Reimer, P.A., on June 26, 2012. *Id.*

19. In completing and signing the Questionnaire, Reimer, as owner of David H. Reimer, P.A., agreed as follows:

> I understand the information submitted herein becomes a part of my Professional Liability Application and is subject to the same representation and conditions. The applicant represents that the above statements and facts are true and that no material facts have been suppressed or misstated. *Id.*

20. On or about June 26, 2012 Liberty requested additional information to complete the application, which "Supplement to the Application" was completed and signed by Reimer, as owner of David H. Reimer, P.A., on June 26, 2012 (A true and correct copy of the Supplement to the Application is attached hereto as Exhibit "E".)

21. Question 4 of the Supplement to the Application specifically asked, "Does the Applicant use any of the following conflict avoidance methods: … Insist on obtaining a written waiver from its clients in order to perform on-going services when an actual/potential client conflict exists?" *Id.*

22. In response, a check mark was placed by the word, "Yes." *Id.*

23. Question 4 of the Supplement to the Application also specifically asked whether the firm: "Allow[s] attorneys to enter into business relationships with firm clients?" *Id.*

24. In response, a check mark was placed by the word, "No." *Id.*

25. The follow-up question asked, "Require disclosure if such relationships are permitted?" *Id.*

26. In response, a check mark was placed by the word, "No," and the acronym, "N/A," was handwritten next to this response. *Id.*

27. In completing and signing the Supplement to the Application, Reimer, as owner of David H. Reimer, P.A., specifically agreed, as follows:

> I understand the information submitted herein becomes a part of my Professional liability Application and is subject to the same representations and conditions. The applicant represents that the above statements and facts are true and that no material facts have been suppressed or misstated. *Id.*

28. According to the information currently available to Liberty, it appears that Reimer engaged in merger or acquisition work; Reimer engaged in business with a firm client, as Reimer, through a Florida limited liability company that he owned with his wife, had a twenty-

five percent (25%) ownership interest in a firm client's company; Reimer also served as the vice-president of a firm client's management board and Reimer did not disclose or obtain a written waiver from its clients when an actual/potential conflict existed. These activities were all contrary to the representations made in the Merger and Acquisition Questionnaire and Supplement to the Application that became part of the Professional liability Renewal Application.

29. The scope of legal work performed by the firm, as well as the use of conflict avoidance methods, including the firm's disclosing actual/potential conflicts to clients and obtaining written client waivers, the firm's sole lawyer not entering into business with firm clients or requiring disclosure if such relationships were permitted, were material facts, that, if the true facts had been known, Liberty in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the same hazards.

30. There is a genuine dispute between the Parties as to whether the Policy is voidable *ab inititio* because of Reimer's material misrepresentations in the Questionnaire and Supplement to the Application.

**The Underlying Lawsuit**

31. On June 6, 2014, Dorfman filed a Complaint and Demand for Jury Trial against David H. Reimer, P.A. and Reimer & Rosenthal LLP in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, which was assigned the Case Number 14-10272 (the "Lawsuit"). (A copy of the Complaint and exhibits thereto is attached hereto as Exhibit "F".)

32. On July 17, 2014, Dorman filed an Amended Complaint, adding David H. Reimer as a defendant to the Lawsuit. (A copy of the Amended Complaint is attached hereto as Exhibit "G".)

33. In the Lawsuit, Dorfman alleges that "since 2007, Reimer and the Law Firms [Reimer & Rosenthal, LLP and David H. Reimer, P.A.] have represented Brian Dorfman, Andrew Dorfman (Brian's brother) and several of their affiliated companies." *See* Exhibit G, ¶7.

34. Dorfman further alleges that "in early 2012, after Reimer became in-house counsel, part-owner and an executive at Boss Tobacco Industries, LLC (one of Reimer's clients), Reimer approached the Dorfmans about making an investment in Boss Tobacco." *Id.*,¶8.

35. Dorfman also alleges that "[i]n April 2012, the Dorfmans, through one of their companies, Little Dorf, Inc., invested $100,000 in Boss Tobacco. In the transaction, Reimer and the Law Firms, Reimer and Rosenthal, LLP and David H. Reimer, P.A., represented both Boss Tobacco and Little Dorf." *Id.*, ¶9.

36. In addition, Dorfman alleges that in June 2012, Reimer approached the Dorfmans about making another investment in Boss Tobacco. Dorfman agreed to wire transfer $400,000.00 into the law firm's IOTA Trust Account for a 120 day period, in which Dorfman could conduct additional due diligence on Boss Tobacco. If after the 120 days, Dorfman chose not to invest in Boss Tobacco, the $400,000.00 would be returned to him. In consideration for escrowing the funds for 120 days, a payment of $10,000.00 a month or $40,000.00 for 120 days as the Escrow Fee was to be paid to Dorfman, while the due diligence for the investment opportunity was completed. Reimer signed the Escrow Agreement, which included the written promise that he would "hold the money in trust," and Dorfman wired $400,000.00 into the David H. Reimer IOTA Trust Account on June 6, 2012. *Id.*, ¶¶ 10-14.

37. Dorfman further alleges that after the due diligence period ended in October of 2012, Dorfman requested the return of the $400,000.00. Based on Reimer's assurance that the escrowed funds were still safe, Dorfman agreed to extend the return for an additional escrow fee of $10,000.00 a month. However, in January 2013, for the first time, Reimer told Dorfman that the escrowed funds were no longer in the Trust Account and could not be returned, as they had been transferred out of the Trust Account: $391,000.00 went to third parties and $5,000.00 went to Reimer's operating account. *Id.*, ¶¶15-18.

38. According to Dorfman, Reimer "acknowledged his errors," agreed to pay Dorfman $580,000.00 and executed a promissory note in that amount. However, Reimer then failed to make any payments on the promissory note. Further, Reimer was in arrears regarding the escrow fee payments. These events transpired over a period of at least twelve (12) months. *Id.*, ¶¶19-20.

39. The Lawsuit alleges legal malpractice – professional negligence, breach of fiduciary duty, and breach of contract. Specifically, Dorfman alleges that Reimer and the law firm: (1) entered into business contracts with Dorfman without proper disclosures, the option to seek advice of independent counsel, or informed consent; (2) failed to adequately document business transactions between the parties; (3) failed to disclose material facts; (4) failed to withdraw from representation when confronted with an "unwaivable conflict"; (5) failed to supervise; and (6) failed to comply with the Florida Bar's Trust Accounting Rules. *Id.*

40. On January 23, 2015 Reimer's deposition was taken. Reimer testified that as part of his corporate work, he advised and assisted with mergers of some of the Boss companies; that he was a part-owner and executive of Boss at the same time that he was representing that entity, the Dorfmans and the Dorfmans' affiliated entities; that Boss Holdings and its affiliates were

clients of Reimer & Rosenthal while he was with the firm, but when he left that firm in July of 2012, he took the Boss entities, the Dorfmans and the Dorfmans' entities with him to his firm, David H. Reimer, P.A. (A copy of Reimer's deposition transcript is attached as Exhibit "H".)

41. Reimer also testified that the Dorfmans invested $100,000.00 in Boss Tobacco earlier in 2012 and that Dorfman agreed to escrow $400,000.00 while Dorfman conducted due diligence to determine whether he wanted to invest in a Boss entity, which also was a current client of Reimer's. Reimer drafted the escrow agreement. Dorfman wire transferred $400,000.00 into the David H. Reimer IOTA Trust Account in conjunction with a one hundred twenty (120) day due diligence period. The escrowed funds were not to be released to any third party, unless Reimer received express, written instructions from Dorfman. After the one hundred twenty (120) day diligence period passed, if Dorfman chose not to invest in Boss Tobacco, the funds were to be returned to Dorfman. There was to be a $40,000.00 Escrow Fee ($10,000.00 per month) paid by Boss Tobacco during the diligence period *Id.*

42. Reimer further testified that he did not find written instructions from Dorfman allowing escrowed funds to be transferred to third parties, but the escrowed funds were transferred by him out of the Trust Account and disbursed on June 6, 2012. Mark and Karen Getelman, Reimer's brother-in-law and sister-in law received $341,000.00 as a repayment of money they had loaned Boss Tobacco. The Christy Hertz Trust Account received $50,000.00 for one of the payments that a Boss entity needed to make to a divorce attorney. Attorney Hertz's client was the ex-wife of Reimer's client, Shlomo Ben-Tov a/k/a Sam Goodson, and payment was made regarding a continuing family matter involving the Boss entities. In fact, the payment was made so that the Boss entities would be allowed to continue to operate. Also, Reimer's operating account received $5,000.00. *Id.*

43. Reimer also testified that he personally executed a promissory note for $580,000.00 to repay Dorfman, which amount represented the $400,000.00 escrowed funds for the eight (8) months, with a $10,000.00 escrow fee per month and $100,000.00 for the original investment in 2012, but he never made any payments on the promissory note. *Id.*

44. Liberty has been defending the Lawsuit under a reservation of rights, and seeks guidance from the Court as to the rights and responsibilities of the parties pertaining to the following Policy provisions.

**Insurance Policy Provisions**

45. The Policy issued by Liberty states, in relevant part:

> **THIS IS A CLAIMS-MADE POLICY. PLEASE READ IT CAREFULLY.**
>
> **LAWYERS PROFESSIONAL LIABILITY POLICY**
>
> **<u>Preface</u>**
>
> This policy provides professional liability protection for your law firm. The terms **we, us,** and **our** refer to Liberty Insurance Underwriters, Inc., the company issuing this policy, and the terms **you** and **your** refer to those persons or legal entities insured by this policy. The **named insured,** an entity incorporated within the terms **you** and **your**, has special duties and responsibilities, which are described in the policy.
>
> * * *
>
> There are exclusions and conditions that apply to the coverage provided by this policy. All persons and entities afforded protection by the policy should read it carefully. This preface is provided for information only and does not provide or modify coverage.
>
> **<u>Coverage</u>**
>
> **We** agree with the **named insured** that in consideration of the premium paid, **your** obligation to pay the deductible, and in reliance upon the statements made by the **named insured** in the application, the Declarations, and supplementary information provided by the **named insured**, and subject to the limits of liability as stated in the Declarations,

and the exclusions and all other terms and conditions of this policy, as follows:

**We** agree to pay on **your** behalf all **damages** in excess of the deductible amount and up to the limits of liability stated in the Declarations that **you** become legally obligated to pay, provided such **damages:**

1. result from **claims**

   a. first made against **you** during the **policy period** or any extended reporting, if applicable, and

   b. reported to **us** in writing; and

2. are caused by a **wrongful act** which takes place before or during the **policy period** but not before the Retroactive Date set forth in the Declarations, if any.

The following Policy definitions are applicable to the Coverage provisions and relevant to this claim:

4. **damages** means a monetary judgment or settlement, but does not include fines or statutory penalties, sanctions whether imposed by law or otherwise, any other amount awarded in any **disciplinary proceeding**, the return of or restitution of legal fees, costs and expenses, punitive or exemplary damages, the multiplied portion of multiplied **damages**, amounts for which **you** are not financially liable or which are without legal recourse to **you** or matters which may be deemed uninsurable under applicable law.

6. **named insured** means the person or entity designated in the Declarations and any **predecessor** of such entity.

7. **organization** means a corporation, partnership, association, trust or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature.

11. **professional legal services** means legal services and activities performed for others such as:

a. a lawyer;

* * *

Services performed by **you** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be

professional services in **your** capacity as a lawyer, although such services could be performed wholly or in part by nonlawyers.

15. **wrongful act** means any actual or alleged act, error, omission or **personal injury** which arises out of the rendering or failure to render **professional legal services.**

16. **you** means:

a. if the **named insured** is an individual, such individual;

b. if the **named insured** is a partnership or limited liability partnership, such partnership or limited liability partnership and each lawyer who is a partner thereof including any incorporated partner and each shareholder of any such incorporated partner;

c. if the **named insured** is a professional corporation or professional association, such professional corporation, limited liability corporation or professional association and each lawyer who is a shareholder or member thereof;

d. each lawyer employed by the **named insured;**

e. any person

1. who qualified prior to the **policy period**, but who no longer qualified as of the first day of the **policy period;** or

2. who during the **policy period** qualifies

as an **insured under** b., c., or d., immediately above, but only to the extent such person performs or has performed **professional legal services** on behalf of the **named insured;**

f. each lawyer acting as "of counsel" but only while performing **professional legal services** on behalf of the **named insured**….

46. The Policy, however, contains the following exclusions:

**<u>Exclusions</u>**

1. **<u>Known Claims or Circumstances</u>**

This policy does not apply to any **claim** arising out of a **wrongful act** occurring prior to the **policy period** if, prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by **us** to the

**named insured** and continuously renewed and maintained in effect to the inception of this **policy period:**

b. **you** had a reasonable basis to believe that **you** had breached a professional duty, committed a **wrongful act**, violated a disciplinary rule, engaged in professional misconduct or to foresee that a **claim** would be made against **you**….

* * *

2. **Fraudulent, Criminal, Malicious, Deliberately Wrongful Acts, or Omissions.** This policy does not apply to any judgment or final adjudication based upon, arising out of or in any way related to any dishonest, fraudulent, criminal, malicious or deliberately wrongful acts or omissions committed by **you. We** will defend allegations of the foregoing acts or omissions until the time they are finally adjudicated or admitted by **you.**

This exclusion does not apply to each of **you** who did not personally commit, personally participate in committing, or remain passive after learning about one or more of the acts or omissions described in this exclusion. However, **our** obligation to provide coverage in any such case shall be excess of the deductible and excess of the full extent of any assets in the **named insured,** or monetary value attributed to such assets, of anyone to whom this exclusion applies.

3. **Certain Services and Capacities**

This policy does not apply to any **claim** arising out of **your** services and/or capacity as:

a. an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured** ….

***

5. **Insured versus Insured.** For the purpose of this sub-section, the term "insured" shall mean "you." This policy does not apply to any **claim** made by one or more insured against another insured unless an attorney/client relationship exists.

6. **Equity Interests.** If a person insured under this policy owns, along with his or her spouse, more than ten percent (10%) of the issued and outstanding shares, units or other capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective interest of:

a. all persons and entities insured under this policy;

b. spouses of persons insured under this policy; and

c. the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.

47. It appears from the information currently available that the entirety of the Claimant's alleged harm stems from Reimer's providing investment consulting services on behalf of organizations that are not listed as insureds under the Policy, and thus the claim would not meet the requirement that Coverage is only provided to the extent the insured is providing professional legal services. *See* Policy, Coverage, at page 1.

48. It appears from the information currently available that the entirety of the Claimant's alleged harm also stems from Reimer's raising funds on behalf of another client's company, Boss Tobacco, where he owned more than 10% of the outstanding shares of the ultimate parent company, Boss Holdings, through a limited liability company with his wife. However, Reimer did not disclose to Dorfman his own financial interest in the Boss entities in that he and his wife, through a business entity owned and controlled solely by them, had a 25% ownership interest in Boss Holding, the ultimate parent of Boss Tobacco, or that he had provided professional legal services to the Boss entities and the Boss entities' principals prior to and /or while simultaneously providing professional legal services to the Dorfmans and the Dorfmans' entities. Also, Reimer admitted to wrongdoing during his deposition taken in January of 2015.

Reimer admitted that he removed Dorfman's funds from the IOTA Trust Account and transferred them to third parties and his own operating account, yet Reimer has not produced written instructions from Dorfman authorizing this and Reimer has not produced any Conflict Waiver documents signed by these clients. As such, several Policy exclusions would be applicable. *See* Policy, Exclusions 1. Known Claims or Circumstances; 2., Fraudulent, Criminal, Malicious, Deliberately Wrongful Acts, or Omissions; 3., Certain Capacities and Services and 6. Equity Interests.

49. Based on the information currently available it appears that Reimer had a "reasonable basis to believe" he had "breached professional duty, committed a wrongful act, violated a disciplinary rule, engaged in professional misconduct and to foresee that a claim would be made" against him under the Policy's exclusionary language. *See* Policy, Exclusions, 1., Known Claims or Circumstances.

50. The Policy thus specifically excludes coverage for the Lawsuit.

51. Therefore, there is a genuine dispute between the Parties as to whether there is coverage for the Lawsuit.

**Declaratory Judgment**

52. Liberty realleges and incorporates the allegations contained in Paragraphs 1-49 above as if fully set forth herein.

53. An actual, justiciable controversy exists between the Parties regarding whether the Policy is voidable *ab itinitio* given the material misrepresentations within the Renewal Application, Questionnaire and Supplement to Application within the meaning of 28 U.S.C. §2201, as demonstrated by the facts alleged herein.

54. An actual, justiciable controversy exists between the Parties regarding Liberty's obligations under the Policy in regard to the Lawsuit, within the meaning of 28 U.S.C. § 2201 as demonstrated by the facts alleged herein.

55. Accordingly, Liberty seeks an Order from this Court determining whether the Policy is voidable under §627.409, Florida Statutes.

56. Moreover, if the Policy is not found to be voidable, Liberty seeks an Order from the Court determining the obligations of Liberty to the Parties relative to the Lawsuit, including a determination that Liberty is not obligated to defend and/or indemnify David H. Reimer, David H. Reimer, P.A. and Reimer & Rosenthal, LLP relative to the Lawsuit.

57. A bona fide, actual, present practical need for a declaration exists.

58. The declaration requested concerns a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

59. A privilege or right of the Plaintiff is dependent upon the facts or the law applicable to the facts.

60. The Parties have an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

61. The relief sought by Liberty is not merely the giving of legal advice or the answer to questions propounded for curiosity.

62. Further, Liberty seeks an Order awarding Liberty such other relief as the Court deems proper.

WHEREFORE the Plaintiff, Liberty Insurance Underwriters, Inc., respectfully requests that this Court resolve this controversy pursuant to FED. R. CIV. P. 57 and 28 U.S.C.A. § 2201

and determine the rights and obligations of the Parties under the Policy relative to the Lawsuit and Policy Demand.

Respectfully submitted this 31st day of March, 2015.

LYDECKER |DIAZ
*Attorneys for Plaintiff,*
*Liberty Insurance Underwriters, Inc.*

1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
(305) 416-3180 – Phone
(305) 416-3190 – Fax

By: _/s/ Michael E. Longo
STEPHEN HUNTER JOHNSON
Florida Bar No. 12362
shj@lydeckerdiaz.com
MICHAEL E. LONGO
Florida Bar No. 28058
ml@lydeckerdiaz.com
SHERYL S. NATELSON
Florida Bar No. 794340
snatelson@lydeckerdiaz.com